Counsel, have you all decided how to divide your time? We will be generous, since there are so many defendants. So, have you all decided? Yes, Your Honor. My name is F.M. Stern, and I will probably be taking about 15 of the 20 minutes, including rebuttal. Good morning, Your Honors. Cara DeVito for Dominic Gonzales. I'll be arguing all the other issues on behalf of all the defendants. All right. Please proceed. Good morning, Your Honors. May it please the Court, Kenneth M. Stern for Appellant Fernandez arguing on both his behalf and for counsel for the joint appellants. This is a case in which the government attempted to make a silk purse out of a sow's ear. And by that, I mean the government took what was at best state court, California state court fines, and attempted to make a federal criminal case out of it. The purpose of this was really for sentencing and helping to place the appellants in federal rather than have them in state prisons. And the government failed in its attempt. It failed both at the pleading stage. It failed at the evidentiary stage. And it failed at the instructional stage. So just as one cannot make a silk purse out of a sow's ear, so, too, the government could not turn this, what by all rights was a state case, into a federal criminal proper judgments. Many of the issues we've raised in here at both the pleading, the evidentiary, and the instructional phases, I will start with instructional problems. And time permitting, we'll also relate those errors to the pleading insufficiency of the evidence problems. I'd like to start out with the vicar counts. The vicar counts, Your Honor, the 18 U.S.C. 1915 counts. There were many problems with the instructions regarding this count or these counts. I think perhaps the largest problem is there are two alternative prongs in terms of what is thought of as or called the murder for hire prong or the prong where one doesn't act to gain entry to an organization or maintain or advance one's position within that organization. The latter one is what's really the government's theory. Is that not correct? Well, I believe they presented the case on really both theories. But on the first theory, the former theory, the problem lies in the fact that there has to be a quid pro quo consideration for the act in exchange for consideration. In other words, an offer of money in exchange for killing somebody. So what evidence was presented by the government, in your view, to support the first theory? Well, there was no quid pro quo evidence. As to the improper theory, which was created by the instructional error, they were allowed to submit and did submit that issue to the jury based upon the theory that if it was the appellant's intent to increase their drug territory and therefore make more money selling drugs by conspiring to murder certain people, that under the instruction given, that would be sufficient to find our clients guilty of the U.S.C., 18 U.S.C. 1959 counts. Were both theories presented to the jury for consideration? Yes, Your Honor, they were instructed as to both theories, and evidence was presented as to both theories. That's what I was asking. What was the evidence regarding the first theory that was presented by the government? Well, the evidence that ties into the instruction given would be the evidence that getting rid of certain people, our clients could increase their drug territory and make more money. That's improper under 18 U.S.C. 1959. There was a proper instruction would have been to say there must be a direct quid pro quo that they are being paid to, in exchange for murdering these people, they are being paid money to do that. There was no evidence of that. What if they were told, if you murder this person, we will grant you an extension of your territory? Because we allocate territory. There is no evidence that that occurred, Your Honor. Your objection, I gather, is that that link wasn't made, is it? No, there was no link. There was no evidence of that. And, yes, it could be that type of consideration. It wouldn't have to just be money. But there was no evidence of that. There was no quid pro quo. It was the very indirect theory, which a jury very may well have found our clients guilty on, this indirect increase in their profits by getting rid of certain people. But there was no exchange of quid pro quo. An issue that is another failure in the instruction was a failure to plead interstate nexus between the drug conspiracies, which were count three and count four. It is our position that if this were merely intrastate drug transactions, then there is no federal jurisdiction. In the Oakland cannabis buyers case, the Supreme Court noted that issue, but said that they were not going to address it because nobody had briefed it. Since that time, that issue is now pending in the United States Supreme Court via a case, which I'm not going to cite because I can no longer cite it, having been accepted to the U.S. Supreme Court in which the Ninth Circuit did address that issue and indicated that there had to be an interstate connection. That was another California marijuana initiative act. So that issue is before the Supreme Court at this point. But I think our briefs fully demonstrate that there must be some sort of interstate nexus, and the jury was never instructed on that. There was never any instruction. First you said there was a failure to plead an interstate nexus, and now you're saying the jury was not instructed on interstate nexus. Are you making both of those arguments? Yes, Your Honor. I'm trying to stick with the instructions now. But, yes, as I indicated, many of these errors are at every stage. There was a failure of pleading, there was a failure of proof, and there was a failure of instruction on this issue. So right now you're on the instructional area, and you're saying that the jury had to be specifically instructed that the government had to prove an interstate nexus between the criminal activity, with the criminal activity. Yes, and, Your Honor, the way this has been done historically is I believe it's 21 U.S.C. 846, in which there is a congressional finding that anything having to do with drugs is factually and automatically involved in interstate commerce. We don't believe that is correct. We don't believe that is constitutional. Our clients never had the opportunity to cross-examine Congress. Regarding counts one and two, it's not sufficient for RICO if decision-making is ad hoc. And I've discussed this with counsel, co-counsel. I've looked at dictionaries. I've looked at cases. There's not really a lot on what ad hoc is, what it means. There is a California case that talks about a situation where there's all types of administrative rules and regulations and procedures and statutes, and yet there's still they considered it to be an ad hoc decision-making process. I believe this, being an element of the crime alleged, I don't think that it's a term that laymen commonly understand or know what it means. I believe that, and quite frankly, at this point, I'm still not sure I know what it means after studying it. It's something that really does not come up very much in court decisions, but I believe the jury had to be instructed as to this. It is not a person's term, although certainly we hear it from time to time. I don't believe it is a term commonly known or understood by juries or laypersons. Also, I don't believe that the jury was properly instructed regarding the katiokos, multiple conspiracy situation. You know, I had to read through the jury instructions many, many times to be able to even figure out what the government and the court believed to be the katiokos. What instruction was given on multiple conspiracy? Well, it was a very vague instruction in which it talked about being, they're being pleaded a conspiracy and you have to find a conspiracy to find the defendants guilty and you have to find the conspiracies pleaded. But it didn't get into the katiokos issue where there's pleaded one conspiracy, but evidence is presented on multiple conspiracies and it really never explained to the jury that distinction. But wasn't the jury told that even if you find the defendant guilty of some other conspiracy, that's not enough to find him guilty of this conspiracy? It wasn't something of that nature given? Well, I don't think it was nearly as precise as Your Honor is stating. It was very vague. It really did not specifically talk about other specific conspiracies or other wholly contained conspiracies. It was a very vague, overbroad instruction. Where did you find that particular instruction in the record? Your Honor, that would be at excerpts of record pages 697 through 698. And it states, even though a particular defendant did not directly conspire with other conspirators in the overall scheme, the defendant has in effect agreed to a part to participate in the conspiracy if it is proved beyond a reasonable doubt that ellipses, three, the defendant had reason to believe that whatever benefits the defendant might get from the conspiracy were probably dependent upon the success of the entire venture. My recollection was there was a different instruction, too, that said something about if you find him guilty, maybe I'm confusing this with one of the other cases, but I thought it said something about he may be guilty of another conspiracy, but if you can't find him guilty of this conspiracy, that's not in this case. I don't believe so. And that, I think, is the problem, Your Honor. And I think the evidence showed multiple, if the jury was to believe these existed, multiple wholly internal consistent separate conspiracies that were freestanding, which were not dependent upon any other conspiracies. So I believe that that was an important mistake as to those charges. I'd like to tie in some of the issues I've talked about now as to the failure to properly instruct us to the sufficiency of the evidence. I believe the only evidence in this case is that any decision-making was ad hoc. There was no board of governors or board of directors. There was no what might we call officers of the so-called Mexican mafia. In fact, we cite in our brief a case that even noted that the Italian mafia in New York, the five families actually had a board of director-type organization. Here we have an organization that the government claims exists, several hundred people, and all of the decision-making, for the most part, a problem would happen and just a few people would get together and make the decision. To me, that's ad hoc decision-making. Even though there were a few rules here and there, this is still ad hoc. A couple of people who were directly related to the issue would get together and decide. And to me, that's purely ad hoc. Counsel, could we go back to the conspiracy instruction for just a minute? At the government excerpts of record 1151A-52, the following instruction was given. With regard to each of the conspiracies charged in the first superseding indictment, you must decide if the conspiracy charged in the indictment existed and if it did, who at least some of its members were. If you find that the conspiracy charged did not exist, then you must return a not guilty verdict even though you may find that some other conspiracy existed. Similarly, if you find that any defendant was not a member of the charged conspiracy, you must find that defendant not guilty even though that defendant may have been a member of some other conspiracy. That's the instruction I was thinking about. You don't think that instruction was specific enough to cover your issue regarding multiple conspiracies? No, I don't, Your Honor, because it doesn't really discuss the fact of other conspiracies and what is required of other conspiracies and the law of that for the difference in distinctions between what is a multiple conspiracy and what is a single conspiracy. For example, for a single conspiracy versus a multiple conspiracy, if it's a freestanding conspiracy where one conspiracy is not dependent upon another conspiracy, then it is multiple conspiracies where if all of them are interrelated and one is dependent upon the other, then it's a single conspiracy. So the instructions really never fleshed out for the jury what the differences are between multiple and single conspiracies. And what's your best case authority for the proposition that the multiple conspiracy instruction has to be that detailed? Well, Your Honor, the basic principle that all elements of the crime must be, as to every material issue, must be given. And I believe Katkios itself would discuss that. So that would be my best case on that count. I see I only have four minutes left. So if the court is going to give us a little bit more time than our 20 minutes, I'd like to take a few more minutes before I reserve for rebuttal. We're not giving 20 minutes to each of you. I understand, Your Honor, but. Please complete your argument. You have time to complete your argument. Let me talk about the pleading problems briefly. I've talked about the interstate commerce problem. I believe that the pleading was wholly conclusory without the required evidentiary allegations. The Vaker counts are not properly pled for the same problems I discussed regarding the instructions. There was no failure to plead an interstate nexus. And I believe these errors are prejudicial per se. Again, as I was stating, I believe there's no evidence that the decision making was anything but ad hoc. Regardless of the fact that there may be some rules and structure, that does not mean that there is not ad hoc decision making. There's no evidence that any of the access to the Vaker accounts were committed on behalf of or for the enterprise. And I think to say that the enterprise itself is sanctioning or approving of one member attempting or conspiring to kill another member or associate, I don't think you can have that. I think this is a situation where the evidence showed a few people got together and acted on their own. Let's say a dentist is a member of the American Dental Association, commits malpractice, and then gets together with the dental assistant, they conspire to abandon the patient. If the patient comes back to correct the problems, I don't think the fact that they got together and made some decisions together or she was a member of the American Dental Association, somehow that means that they acted on behalf of the American Dental Association. No money went into the so-called Mexican Mafia coffers. This was a few people acting on their own who just happened to be part of an organization that supposedly exists, but were not acting for or on behalf of the organization. And I would like to reserve a few minutes for rebuttal. Thank you. Thank you, counsel. May it please the Court, Judge Rawlinson, you read an instruction from the government's excerpts of record and questioned whether that didn't cure the problem about multiple conspiracies. And I want to suggest to the Court that it couldn't because of the evidence that was produced at trial, specifically these two areas of evidence. One area of evidence, which is discussed in the joint opening brief, is that if there were multiple small conspiracies, they occurred among two or three people, and I'm going to refer to those as splinter groups from the overall organization. But there also was a substantial amount of evidence that many of these criminal acts occurred because there was a feud between two different factions of this organization, the Terzak group versus the Martinez group. My concern is that the jury would have been confused by the reference to other conspiracies in the instruction that you read, because the jury wouldn't have known whether other conspiracy meant the Terzak group's acts against the Martinez group, which aren't charged conduct, or the acts of these small splinter groups in individual criminal acts, which are charged conduct. Did the jury express any confusion by way of notes, requesting explication of the instruction or anything of that nature? No, Your Honor. I don't believe they did, not on this particular instance. But that doesn't mean they weren't confused. That could indicate that they had made up their own minds what another conspiracy meant, and they might have made up their minds incorrectly. I think that's a very real concern here, because of the amount of evidence that went to the Terzak-Martinez feud. Your Honor, turning the courts... I mean... I'm sorry. Are you saying then if there is a feud within a conspiracy that negates the existence of a conspiracy? Is that your argument? No, Your Honor. Your Honor, what I'm suggesting is that the evidence at trial admitted of two factions within this alleged organization, and the evidence was that those two factions were feuding. The instruction that the Court read a moment ago talked about how the jury shouldn't find someone guilty of the overall conspiracy if they believe they were acting on behalf of some other conspiracy. And I'm just suggesting there's certain acts that were testified to at trial which could have been conspiracies in and of themselves, and the jury would have been confused between charged and uncharged acts that could have led to conspiracies. Did that all clarify for the Court what I'm saying? Okay. What instruction should have been given in your view? I think just a simple sentence that clarified that what was actually being charged here, the only thing the defendants could be found guilty of, was if they were acting on behalf of this overall organization within one conspiracy, but that if the jury found individual members acted on their own behalves, even if that was a conspiracy, that that was not sufficient to allow the jury to find these defendants guilty of the charge. I don't think it's clear enough for jury purposes. We're lawyers and judges here. We know what we're talking about when we discuss these things. I don't think laymen do. I think it needed to be explicated a little bit more. Your Honors, with respect to the wiretaps here,   I think it's clear enough for jury purposes. I think it's important to consider when the Court has the opportunity to review this case, I'm asking it to look specifically at the applications for Lines 6 and 7 to consider one point in particular, whether those applications show there was real necessity for the issuance of those wiretaps. And I don't believe there was because a wiretap should not issue in the first instance. It's basically a last-ditch effort after all other investigative techniques have failed. Counsel, you're, I'm sure, very familiar with the Chirac case. What's different about this case? I think the amount of information that the government was able to get from all these other sources, which they didn't really discuss in their application. They had confidential informants providing them with information. They had a witness, a confidential informant, Terzak, eventually his identity became known, who allowed them to put wiretaps on his phone. They had the opportunity to go to other areas to get more information, but they chose not to. The specific other areas I have in mind, they could have gone to the State and asked for the State's cooperation because my client and several of the other defendants were on parole or probation, and at the time these wiretaps were going on, the law was in flux, but at least in California, parole searches were being allowed. Now, what was the circumstance in Chirac? Similar, Your Honor, but not, in the Chirac case, they didn't have quite the volume of available information from other sources as they did here. At least my reading of the case suggests that. And again, going to the State, they could have gone to penal authorities, and in accordance with a case called People v. Lloyd, social conversations in jail and prison can be monitored and intercepted and transmitted. So surveillance, interrogation of witnesses, interrogation of people on the street and confidential informants, all of those areas were providing the government information to build their case. But I submit to the Court there was a reason why the government wanted these wiretaps. The necessity for them, however, wasn't to build the case. The necessity for them went further down the line. The government was looking into the future to what would help them make the case at trial. Because at trial, the government relied on two different things, Terzak and Roshin, who were confidential informants and government witnesses who had participated in these crimes themselves, and the wiretap evidence. Absent the wiretap evidence, the government still had a good case. They had insiders who had personal knowledge who had participated, but those insiders were not credible or were perhaps very unsympathetic witnesses to a jury. The government might not have obtained as many convictions as they did had the jury been relying solely on the credibility of these people who admitted they had lied, committed crimes, murdered. Well, could there be a reason to authorize a wiretap if the witnesses that you have infiltrated with are subject to impeachment? Is that a reason, Your Honor? I haven't been able to find any case law about that, and I don't mean that in any kind of facetious way. I don't believe a necessity for the wiretap is that your evidence isn't credible. The necessity for the wiretap is there's no other way to obtain this information. And here, to sustain the burden of proof at trial, the government needed these wiretaps, because a wiretap is essentially irrefutable evidence. These confidential informants were subject to impeachment because they were liars, because they were convicted of prior felonies, and so there was a bias against their testimony. So the necessity for this wiretap wasn't to get to trial in the first place. It was to win the conviction. Your Honor, unless the Court has questions about other specific substantive issues, I want to just quickly address some issue applicable to Mr. Gonzales, my client. Are you speaking on behalf of Defendants Sanchez and Schoenberg Sanchez as well? No, Your Honor, just Dominic Gonzales as to the sentencing issue. Is anyone going to address the issues of those two defendants? Or will you just leave us to figure it out on our own? All right. If you could just briefly, I would just appreciate if Counsel for Defendants Sanchez and Schoenberg Sanchez would tell us if there are any issues specifically that you're raising on their behalf, just briefly. When she finishes. When she finishes. Your Honor, I had filed a motion for leave to file a supplemental Blakeley issue, and the Court denied it without prejudice to my refiling it, which I will do tomorrow. But I want to direct the Court's attention to the fact that in a supplemental opening brief, Mr. Gonzales argued that at least one level of his current sentence is improper because it involves double or even triple counting of the same fact. Specifically, that has to do with extortion, which was an uncharged act. If I can break it down for the Court, Judge Carter decided to make count 29, which was felon in possession of a firearm, the base term, if you will, in this case, and it provides for a level 24 offense. That was increased four levels for the fact that the gun that my client possessed was possessed in connection with another crime, specifically the racketeering activity. When you look at the charges in the racketeering activity, they break down into two different areas, conspiracy to murder and conspiracy to distribute drugs. The evidence in trial wasn't that these defendants acquired and distributed drugs. The evidence was that these defendants facilitated the distribution of drugs by organizing a Fernando Valley and other Valley gangs so that there wasn't internal feuding between them so that they could distribute drugs more efficiently. And the manner in which the defendants are charged with having done that is by taxing the gangs, taxing meaning we're going to set up a system whereby you pay us a certain amount of money and you'll be allowed a certain amount of territory and you can distribute your drugs. But the taxing activity is just extortion. That's all it is. Extortion was not charged in this case, but the taxing activity through the distribution of drugs was. And Judge Carter recognized that the taxing and the distribution of drugs were the same thing. That appears in excerpts of record 895 and 896. So Mr. Gonzalez was at a base level 24 for his possession of a gun. Then he's increased four levels for racketeering, which includes taxing through distribution of drugs. And then Judge Carter added another one of the following three levels for uncharged extortion. So I submit to the Court at least one level of Mr. Gonzalez's eventual adjusted level 31 sentence has to be reduced to a level 30 because the extortion is counted as an uncharged crime and also as part of the racketeering activity. Does the Court have any questions about any of the substantive issues or about that sentencing issue? It appears that there are not. Thank you, Your Honor. Would counsel for the other defendants just please approach and let the Court know if there are any issues that you have that have not been addressed by the counsel who have addressed the Court this morning? Well, Your Honor, it appears for Mr. Contreras I had intended to submit on our briefing, our individual briefing, and I did submit a 28-J letter dealing with Blake Lee issues. You represent Gonzalez? Yes. And you think that there's a Blake Lee issue? I do, and I have submitted a 28-J letter specifying what they are. You have raised the burden of proof issue already in your briefing, so I think you're clearly in on the Blake Lee issue. Thank you, Your Honor. Thank you, counsel. Of course. Good morning, Your Honors. My name is Karen Bucher. I represent Jimmy Sanchez. Can you speak louder? Yes. My name is Karen Bucher, and I represent Jimmy Sanchez. And I did raise individual issues for Mr. Sanchez, but I believe they've been fully briefed. All right. Thank you. You're welcome. Good morning, Verna. We fall on behalf of Suzanne Schoenberg Sanchez, who is also present here. There are no Blake Lee issues. She is out of custody right now. But they are in the individual briefing. Given the time constraints, I had intended to submit on the brief, but the critical issue on her behalf is the failure to prove any RICO conspiracy, any allegation that she conspired to direct the affairs of the Mexican Mafia. She was simply married to her co-defendant, and the only evidence that came out was that she ran errands for him. Certainly nothing to do with directing the activities of the Mexican Mafia. All right. Thank you, counsel. Thank you. Good morning, Your Honors. May it please the Court. Darlene Ricca on behalf of Appellant Roy Gavaldon. I had only one individual issue, which was sufficiency of the evidence, and I would submit on the brief. Thank you. Thank you, Your Honor. Thank you, counsel. Now we'll hear from the government. Thank you, Your Honor. May it please the Court. My name is Janet Hudson, and I will be addressing most, I think, of the issues that were raised here at oral argument. However, some of my colleagues, from whom you've already heard, Mr. Rowley and Mr. Dugdale, are prepared to address other issues, particularly Mr. Rowley will address the sentencing issues, if the Court wishes to hear an argument on that. Just briefly, with respect to the issues that have been raised on this case, counsel stated in his, Mr. Stern stated, in enumerating the alleged errors in the instruction of the jury in this case, that the court's instruction on the murder-for-hire theory was inadequate, and he claimed that there was evidence presented as to this theory and that the government argued this theory. That is incorrect. As the government noted in its brief, the indictment only alleged the status murder motive, the alternative motive. The government argued only the status murder motive. It's not clear why Judge Carter gave any instruction on the alternative theory, but the government certainly never argued. And as counsel himself said, there was no evidence presented that people were being paid to commit murders on behalf of the enterprise. So the government's – any error in how elaborately he explained what that theory was, was really harmless because that was not the theory. Kennedy. His instruction talked about paying money, too, didn't it? It was narrowed down. Kagan. It did. And – Kennedy. No evidence of that. Kagan. Well, right. Ginsburg. Did you object to that? Kagan. I'm sorry?  Did you object to that? Kagan.  No, and I think I really – I wasn't there personally, but I think it was a form instruction that instructed the two – you know, gave a brief explanation of the alternative theory, and somebody forgot to strike that out. But under the circumstances, the fact that that instruction was given appears to be harmless in light of the fact that all the evidence and the argument centered on the status of their theory, and counsel is arguing not that that instruction shouldn't have been given, but that it should have been more elaborate. And I just don't see that as error in this case, certainly not reversible error. Counsel also argued that there should have been an interstate nexus both pleaded and there should have been instructions given to the jury regarding finding an interstate nexus as to the drug conspiracy. That's not currently the law of this circuit. And while there is an issue now before the Supreme Court as to whether in a particular case of personal cultivation and possession of marijuana within California for medical use, that's not at all the facts that we have here. The drugs in this case were heroin and cocaine, not marijuana, and methamphetamine, not marijuana. There was no indication that the drugs were produced for personal medical use within the State of California. So as the law is that under the laws that currently stands, the drug conspiracy count was adequately pled and the jury was correctly instructed on that. Also, with respect to the multiple conspiracy instruction, I believe that the instruction as the Court read adequately instructed the jury that if they found different conspiracies from what was alleged in the indictment, they would find the defendant not guilty. I don't see that really rewording that would have made that any clearer to the jury. Counsel also argued that has made an argument based on the use of the word ad hoc, which the Court instructed the jury that they had to find, in order to find that there was no request by the defense that the jury be given a definition of the word ad hoc. There's no indication that the jury asked for a definition of the word ad hoc. Even if they didn't understand that portion of the instruction, the rest of the instruction was certainly clear and a correct instruction. And the government submits that the evidence did show that the Mexican mafia was an entity that had a mechanism for controlling the ongoing operations, that these were not just individual people independently and randomly making decisions on their own. And that is also the case regardless of the fact that there were feuds from time to time between different factions that were seeking to take control of the organization. Counsel also argued that the individual Vicar Act were not undertaken on behalf of the enterprise. And again, here we get back to the two possible motives for undertaking these acts. One is to enhance one's status or maintain one's status within the organization, within the enterprise, which was alleged here. And the other is to commit the act for money, and that has to be done on behalf of the enterprise. The payment has to come from someone acting on behalf of the enterprise. Counsel takes that on behalf of the enterprise requirement from that alternative motive, which was not the motive here, and tries to make that an additional requirement under our case where the people were committing these Vicar Acts, were doing it to enhance their status or maintain their position within the enterprise. He says, well, there's an additional requirement that it also has to be done on behalf of the enterprise. That's simply not the case. And his argument that if there are rival factions within the enterprise, then that requirement is not met is unavailing because there is no such requirement. Can I go back maybe to something you said a minute ago? And that is if the feud, the Tursac-Martinez camps are feuding, you said for control of the enterprise, then it's still part of it. It's still part of the enterprise, and their actions are part of it. What is, what makes it clear that they were feuding for control of the enterprise and not simply angry with each other? Well, that's, I think that the reason that they were angry with each other was because they, there was a dispute as to who should be making decisions, who should be in a power position over other people within the organization. So, I mean, I think one could certainly characterize it as a situation where these people didn't like each other, but I think it was essentially, I think that what comes through from the evidence is that this was essentially a power struggle. Who was going to be listened to? Who was going to be looked up to? Within the organization. I'm sorry. Within the organization. Correct, correct. Within the organization. With respect to the wiretaps, I believe that in terms of the necessity argument, I do think that this case is indistinguishable from the TRIOP case. In that case, there were also informants, and it could have been used and were used and did provide a great deal of useful information. And nonetheless, this Court said that when you're dealing with an organization as large and complex and difficult to penetrate as the Mexican Mafia, even having one or more informants is not going to be sufficient to fully accomplish the goals of your investigation, and a wiretap is justified in necessity, as shown in that case as it was in this case. Looking at the Olson affidavit, he was quite unforthcoming about informants other than the CW1. He says, in addition to CW1, the current investigation utilizes other cooperating individuals. These cooperating individuals primarily provide background and historical information. It seems to me that they were providing probably quite a bit more and that he should have included more information as to the status of the investigation and what they knew. Well, it certainly, in retrospect, I'm sure that this affidavit is with any affidavit. One could certainly find ways that it could have been made better. We've, in our cases, in Blackman and one other case, given some very serious advice to the government as to the specificity with which they must bring forth the information in their affidavits. Do you think that this meets that standard? I do, Your Honor. I'm not sure. Is the Court specifically talking about the affidavit for Line 6 or ...? I can't do it. Is the Court specifically talking about the affidavit for Line 6 or...? This is the affidavit that Olson attached to, I think, the first request for wiretapping. All right. Mr. Dugdale is better prepared to address the — if the Court wants to get into the specifics of that wiretapping, I believe Mr. Dugdale is better prepared to address those arguments. I was prepared to address the specific arguments that the defendants in the Fernandez case made to the wiretapping, so I will defer to him on that. And I think I will turn this over. Your Honor, I think I've addressed the issues that were raised that are within my responsibility, and I'll turn this over now to Mr. Rowley to address sentencing and Mr. Dugdale to address the wiretapping. Thank you. Your Honor, with regards to the original Olson affidavit, John Terzak was really the only informant who was placed in a position to give any kind of valuable information. The remaining informants were pretty much source information only, as Olson explains in his affidavit. He says that in a very general way, but he doesn't really tell us why that's all they were able to give or give us any hint as to even who they were. Well, that may be true, but he does talk about — that is true. But he does talk about the difficulties in getting informants into this organization, which I believe applies to these other informants as well. People were not knocking down the door of the FBI to infiltrate a criminal organization, which historically has shown such disdain for informants. So besides Terzak, these other people were really peripheral players. And I agree with the Court, this was a pre-Blackman wiretap affidavit, so it did not have the benefit of Your Honor's opinion in that way. And it could have been done better. But even had information — the defense hasn't suggested that there's any information from these remaining informants that could have been supplied to the Court that would have changed the necessity quotient. I mean, they had Terzak. That's their argument, basically, is we had Terzak in there, and that negated necessity. There's really not any suggestion these other people could have done anything more than Terzak. They clearly didn't. So while the information in the affidavit definitely could have been more complete, it did not negate necessity, especially when you look at it in light of cases like Shyrock, where there was a much more well-placed informant who was conducting videotaped meetings with high-level members of the Mexican mafia, and that didn't negate necessity. And Judge Trott's opinion talked about when you have an organization like this with as many tentacles as the Mexican mafia has, you can't — the largeness of this organization, the complexity of their criminal organization. And as well as that, the Gomez case, the recent case that came out in March from Judge Trott, talked about not only how the presence of such informants doesn't negate necessity, but also something that was brought up by Judge Camby about how there can be an independent basis to have the wiretap just to confirm what your informant is doing and to fend off impeachment for your cooperating defendants. I mean, in this case, we have on one hand the defense saying, you had TRSAC, so you didn't have necessity. On the other hand, they're saying, there's outrageous government conduct here because you had TRSAC. I mean, it sounds like the defense really is not giving the government any options at all to investigate this organization. And obviously, this is an investigation that had merit. And turning to wiretaps, specifically at this time, was really the only investigative step that made sense. And necessity was not negated by the presence of TRSAC or anybody else. And with that, I'll submit unless the Court has any questions. Thank you. Thank you. Briefly on the sentencing issue raised by counsel for Defendant Gonzalez, this is laid out in the government's brief. But on the double-counting point, the two enhancements at issue, if I understand the defense argument, are 2B3.2. There's an offense-level enhancement for possession of a firearm. This defendant was also sentenced because he was convicted of being a felon in possession under Guidelines Section 2K2.1. And there was an enhancement assessed in that group for possession of a firearm in connection with another felony. Those two don't double-count the defendant's conduct for a couple of reasons. First, because the provisions really address different purposes. They serve different purposes. The enhancement for possession of a firearm in connection with extortion recognizes that when a defendant, when an extortionist is prepared to carry out his or her threats because the defendant is armed, there's a greater risk of harm to the public. The enhancement for possession of a firearm in the felon in possession context in connection with another felony recognizes the risk that a prohibited person with a gun who is committing a felony, a separate felony, poses a greater risk of harm to the public. So the two policy objectives of the Guidelines are really different. And in this case, there was also different conduct that was covered by the Guidelines. The enhancement for possession of a firearm in connection with the defendant's extortion conduct really addressed the taxing conduct that the defense related to. But the enhancement in the felon in possession context covered a broader range of conduct. Again, the enhancement there is in connection with another felony. And the defendant's conduct in this case was not limited to taxing. He was also convicted of the bouncer murder conspiracy, the conspiracy to murder James Lopez. And in addition, the defendant was convicted of narcotics trafficking. And the evidence showed that he was involved not just in taxing but in direct distribution. So that enhancement really does cover a broader range of conduct. And for that reason, you can't treat the enhancement for possession in the extortion context as being a lesser included offense in the other Guidelines. Counsel, can you address the state sentence and the concurrent running of the state sentence, the court's apparent failure to recognize that it could run the sentence concurrently? Yes, Your Honor. In the government's brief, I believe the government agrees that that was erroneous under this court's decisions. Related to Sanchez. That's right, Your Honor. And it was erroneous for the court not to recognize its authority, statutory authority, to impose a concurrent sentence. But because it was a life sentence in the federal system and there's no parole, it's harmless error. Regardless of when this defendant begins to serve his sentence under federal law, the defendant is going to serve that sentence until the end of his life. And so the government admits that the error was harmless. And if there are no further questions, government is moved. All right. Thank you. Rebuttal briefly. Yes, Your Honor. Thank you. I'll try and speak quickly. Regarding the quid pro quo issue, regardless of what the government's intent was, the matter was submitted both through evidence and instruction to the jury on an improper theory. And all of our clients may well have been convicted under this improper theory. What was the evidence? You keep saying there was evidence. Well, there was some evidence presented, Your Honor. The fact that the effect of the murders, if committed, would expand our client's territory for selling drugs and therefore give them additional profits. And as Judge Candy asked me, would this be a valid consideration quid pro quo if there was an exchange of being given drug territory in exchange for killing these people? And while in theory that would be the case, factually that was not shown here. There was nothing to show that the so-called Mexican mafia indicated to our clients, you know, if you go kill these people, we'll give you additional territory. That may have been an indirect effect, but there was no quid pro quo. The instruction was rather specific to money. Yes, but it was specific to money, but it did not require a quid pro quo. It allowed this indirect effect of the act without being a bargain for exchange. And in fact, the evidence shows this was not even the purpose for the conspiracy to commit these murders. The purpose, which is certainly an invalid defense, but the purpose was these people are going to try and kill us and we better get them before they get us. So therefore, it's not even while there is evidence that the indirect effect would be the drug sale territory would be increased. There was no proof that this was the purpose of any of our clients actions. Regarding the issue of whether it's got to be an interstate connection to the drug charges, I didn't want to get involving get involved in arguing the case, which has now been put up to the U.S. Supreme Court for certain other than to say that issue is pending. But I think regardless of the context, whether it's criminal drug sales versus merit, medical marijuana, personal use, it's not relevant. What's relevant is, is there an interstate connection required? In terms of the ad hoc instruction, I believe that it's an element of the Rico crime to show that these decision makings is not done on an ad hoc basis. And as an element of the charge crime, there's a sua sponte duty. And as counsel for a Pele pointed out, there was this dispute between even members as to what the organization was, who had authority, who did not have authority. Again, this shows there is no organization and matters are determined on an ad hoc basis. In terms of the multiple conspiracies, the court stated, as Your Honor pointed out to the jury, if you find that the conspiracy charge did not exist, then you must return a not guilty verdict, even though you may find that some other conspiracy existed. Now, this is totally meaningless because the jury has to know that if there's one conspiracy, they can convict. If there's multiple conspiracies which have not been charged, they can't convict. But without further instruction as to what the differences are, this instruction is purely meaningless. It does not ---- No, but how different is this instruction from the model jury instruction of the Ninth Circuit? I think this is similar or it may actually be the model instruction. But I think the model, if it is, I think the model instruction is wrong because it simply does not clarify for the jury what their decision-making process is going to be, how they decide whether it's one conspiracy or multiple conspiracies. They have no way of knowing. And therefore, I think it's error and it's prejudicial error. They have not been given the proper guidance on what is and what is not criminal conduct here upon which they can convict. In terms of the wiretap argument, I'm not going to read from the brief on that, but Appelli claims there's no showing that other informants could have brought in evidence to the process without the wiretapping. If you look at our argument on page 103, it shows how this could have been done. And if the Court has no further questions and my other counsel have nothing they would like to say, I will submit, but I would like to defer to other counsel if they have anything to add. Thank you, Your Honor. Your Honor, I'm Karen Bucher for Jimmy Sanchez regarding the concurrent versus consecutive sentence. The case law provides harmless error occurs if the Court would have imposed the same sentence. In this case, the Court was clear that it would have considered a concurrent sentence if it had the discretion to do so, and which is different than two consecutive life terms. Well, what advantage would a concurrent sentence do for your client? Well, it would have been a concurrent sentence versus two life sentences served consecutively. I don't think because... Would he have gotten anything less than life out of it? No, but I don't think he won't be able to complete the first life term as a legal argument because he's going to die anyway. I think he has a right to have his sentences be sentenced concurrently if the Court has discretion. All right. Thank you. Thank you to all counsel for assisting us in this very complicated case. Submission of this case is deferred subject to further order by the Court. And this Court stands in recess. All rise.
judges: B. Fletcher, Canby, Rawlinson